120 BLISS *v.* McELROY.

---

## BLISS *v.* McELROY.

---

PATENTS; INTERFERENCE; DILIGENCE.

In an interference case relating to a system for lighting railway vehicles by electricity, where it appears that the junior party, having invented, constructed, and tested the system in question, laid it aside for five years, during which time he invented, tested, and patented another system, which he believed to be a better one, doing nothing with the first until one—not a party to the interference—applied for a patent, when he filed an application for so much of his invention as the patent covered; that he filed an application for the entire invention a year and a half after a patent had been granted to the senior party, and six years after his alleged conception and reduction to . practice; and that his only excuse is that his means were so limited he could only patent such inventions as he made public,—it will be held that the junior party was lacking in diligence, and that the senior party is entitled to an award of priority. (Following *Mason* v. *Hepburn,* 13 App. D. C. 86; *Thomson* v. *Weston,* 19 App. D. C. 373; *Matthes* v. *Burt,* 24 App. D. C. 265.)

No. 362. Patent Appeals. Submitted January 18, 1907. Decided February 5, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are stated in the opinion.

*Mr. Clyde W. Jones, Mr. Robert Lewis Ames, Mr. Joseph R. Edson,* and *Mr. Edwin B. H. Tower, Jr.,* for the appellant.

*Mr. Charles Neave* and *Mr. W. F. Small* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from the decision of the Commissioner of Patents in an interference proceeding, awarding priority of invention to the senior party, James F. McElroy.

The counts of the issue relate to a system for lighting railway vehicles by electricity, and are as follows:

"1. In a system of lighting railway vehicles electrically, the combination, with an axle, of a dynamo-electric generator of a capacity greater than the normal lamp-load driven thereby, having its field-magnet strength independent of the armature-current, electric lamps and a storage battery connected in multiple with each other to the armature of said generator, a potential-magnet also independent of the armature-current connected in multiple to the said armature, and a field-magnet regulator for the generator controlled by the said magnet.

"2. In a system for lighting railway vehicles electrically, the combination, with an axle, of a generator of a capacity greater than the normal lamp-load driven thereby, having its field-magnet independent of the armature-current and energized by a shunt-circuit, electric lamps and a storage battery connected in multiple with each other to the armature of the generator, a potential-magnet also independent of the armature-current connected to the armature in multiple with the said lamps and battery, a circuit-closer in the main circuit between the point of said circuit at which the magnet and the field-magnet are connected on the one hand, and the lamps and battery are connected on the other hand, and an operating connection between the said circuit-closer and the said magnet, whereby the said magnet and the field-magnet will be permanently in circuit, but the lamps and battery will have their circuit connection closed by the said magnet.

"3. In a system for lighting railway vehicles electrically, the combination, with a generator driven by the vehicle, of a group of lamps and a storage battery connected thereto in multiple, a regulator for the dynamo, a second regulator in the lamp-circuit,

and a magnet measuring the potential applied to the lamps and controlling the said second regulator.

"4. In a system for lighting railway vehicles electrically, the combination, with a generator driven by the vehicle of a storage battery connected thereto, a group of lamps connected thereto in multiple with the battery, a resistance in the lamp branch in series with the lamps, a regulator-magnet between said resistance and the dynamo measuring the storage-battery conditions, a regulator controlled thereby, and supplementary regulating devices controlled by a magnet in the lamp branch measuring the lamp conditions.

"5. In a system for lighting railway vehicles electrically, the combination, with a generator of a capacity greater than the normal lamp-load driven by an axle, of lamps and a storage battery, a switch in the main-line circuit between the said lamps and the battery and the generator, three shunt-magnets all independent of the armature-current but connected to the main line between the said switch and the generator, one being the field magnet, another controlling the field-magnet, and the third controlling the said switch, and two magnets connected to the main line, one being a series magnet controlling the opening of the said switch, and the other being a shunt-magnet for regulating the current delivery to the lamps.

"6. In a system for lighting railway vehicles electrically, the combination, with an axle, of a generator of a capacity greater than the normal lamp-load driven thereby at a variable speed, a potential-magnet permanently connected in a shunt-circuit from the armature, lamps and a storage battery having their connection with the said generator controlled by the potential of the system and their disconnection therefrom by the current of the system, a shunt-circuit containing the field-magnet of the generator, a resistance in said circuit, a motor operating the resistance and a director for the said motor controlled by the said potential magnet so as to be set and maintained for one direction of action of said motor or another as long as the potential of the system is either above or below the point determined by the said magnet.

"7. In a system for lighting railway vehicles electrically, the combination, with a generator, of an automatic connection switch set to connect the generator to the line at a given speed, a storage battery permanently connected to the line while the said switch is closed, electric lamps intermittently connected to the line while the said switch is closed, a magnet measuring the generator-potential, a current-changing regulator controlled by the said magnet and adjusting the amount of the battery-current to the counter electromotive force of the battery whenever the lamps are disconnected, and a resistance in the lamp branch determining, together with the said magnet, the potential applied to the lamps whenever both lamps and battery are connected to the generator.

"8. In a system for lighting railway vehicles electrically, the combination, with lamps and a storage battery in multiple, of a constant-potential dynamo driven by the vehicle at an intermittent and variable speed and having a capacity sufficient to simultaneously operate the lamps and charge the battery, and a current-varying regulator for the dynamo adjusting the volume or armature-current to either the lamps alone (the battery being charged), to the battery alone (the lamps being out of use), or to lamps and battery together."

The senior party, McElroy, filed his application September 9, 1901, upon which a patent issued February 17, 1903. He has taken no testimony and therefore must stand upon his filing date. William L. Bliss [the junior party] filed his application September 10, 1904, which is subsequent to the date of the McElroy patent. As to counts 1 and 8 of the issue, however, Bliss contends that the burden of proof is not so heavily upon him because those counts are a continuation of an application filed by him February 26, 1902, while the McElroy application was still pending in the Patent Office. This contention is contested by McElroy, but we incline to accept the view of the Examiner of Interferences, who alone of the Patent Office tribunals passed upon the question, that these counts "appear to be fairly described in the earlier application."

The Examiner of Interferences and the board of Examiners-

in-Chief hold that Bliss has failed to prove reduction to practice prior to McElroy's filing date. The Commissioner, without considering the evidence bearing upon that question, finds that "his very long delay in asserting claim to the invention discredits his allegations of a successful test of the invention, and makes it necessary to resolve against him any doubt in the matter."

Each of the three tribunals of the Patent Office finds that, regardless of the question of reduction to practice, Bliss has forfeited any right he may have had, by inactivity and delay. We proceed to a consideration of this question, without expressing any opinion as to whether the experiments and tests of Mr. Bliss in 1897 constituted a reduction to practice.

Mr. Bliss is an electrical engineer. From the spring of 1897 down to the time he testified in this proceeding he devoted all his time to the invention of electric-lighting systems for railway cars. The system involved in this issue was the first to engage his attention. This, he states, he conceived in the early spring of 1897, and immediately proceeded to construct in the cellar of 128 Front Street, New York city, where he assembled it for the first time about the middle of June, 1897; that he then devoted several weeks "to testing it under conditions as nearly like those that would obtain upon a railroad car" as he could reproduce; that some of these tests were made in the presence of three witnesses, one of whom was his brother and the other two close friends, and who all testified in reference thereto. The result of these tests, according to the testimony of Mr. Bliss, convinced him that he was "in possession of a thoroughly practical system." He was not convinced, however, that this system as he had developed it "was the ultimate solution of the problem of axle lighting." He thus frankly criticizes his own invention: "I would state that while this apparatus was exceptionally well built and performed its functions under test, in a highly satisfactory manner, a knowledge of railroad conditions led me to analyze and criticize my own work, with the object in view of being able to offer to the public a far better system of car lighting. This apparatus, while nothing like as complicated and trappy as systems of a similar nature found today, having had

an advantage of some eight years in which to have had their crudeness reduced and their operativeness enhanced, was, to my mind, too delicate, too complicated, too subject to derangement, too costly to maintain, and not quick enough, accurate enough, or reliable enough in its operation to warrant its being foisted upon the public." Thereupon the apparatus comprising this system "was carefully dismantled, cleaned up, and set temporarily to one side," where it remained, so far as the evidence discloses, until the application herein was filed. Immediately after dismantling this apparatus Mr. Bliss applied himself to the development of another system. That he worked with great industry and success is evidenced by the fact that his next system, called the "bucker," was actually constructed during the months of July, August, and September, 1897, and an application for patent thereon filed October 14, 1897, which was granted March 29, 1898. The bucker system was tested without delay, and early in 1898 permission was obtained to install it on a Pullman car, and it was in fact installed on such car in March of that year. Mr. Bliss was asked why he placed the bucker system on the car, instead of his original system, and frankly answered that he did so "because the bucker system overcame all of the difficulties encountered in the other apparatus." Subsequently the Bliss Electric Car Lighting Company was organized, and Mr. Bliss was given a salary of $3,000 per year. The bucker system was developed, and exploited, and installed on cars of different railroads, but absolutely nothing was done with the other system, so far as the record discloses. Mr. Bliss was asked by his counsel whether he tried to sell *"these* systems" to the Pennsylvania Railroad Company, or to any other company. To this question Mr. Bliss answered: "I made continual efforts to sell *this* apparatus to other railroads besides the Pennsylvania Railroad Company and the Pullman Company." Mr. Bliss further testified that he developed the bucker system in preference to the one in issue because it "appeared to be a structure far less liable to derangement when placed in actual service;" that there was nothing particularly delicate about the bucker system; that "the bucker proposition looked more

hopeful from a financial standpoint;" that his father, who had advanced money to the enterprise, "insisted upon driving the bucker invention through to a finish, regardless of anything else."

Mr. Bliss made no attempt to secure a patent on any feature of the invention in issue until after he discovered that a patent involving the invention had issued to one Creveling, December 10,1901, although he had, since his conception of this invention, obtained several domestic and several foreign patents on other inventions. On February 26, 1902, shortly after his discovery of the Creveling patent, and *about five years after he had conceived this invention,* and, as he contends, had reduced the same to practice, he filed the application to which he have heretofore alluded. The application herein was not filed by him until more than a year and a half after a patent had been issued to McElroy, and more than six years and a half after the alleged conception and reduction to practice by Bliss.

Mr. Bliss, in answer to this cumulative and overwhelming evidence of lack of diligence, says his means were so limited that he could patent only such inventions as he made public; that the evidence does not affirmatively show abandonment by him, and that he did not in fact intend to abandon his invention; that, as to counts 1 and 8 of the issue, McElroy had not given "the invention of these counts to the public, either by patent or by public use," when the earlier Bliss application was filed, and that therefore the rule announced in *Mason* v. *Hepburn,* 13 App. D. C. 86, is not applicable to these counts.

In *Mason* v. *Hepburn, supra,* Mason delayed the filing of his application about seven years after conception and reduction to practice, while Hepburn's application was filed about nine months, and a patent was issued to him about four months, *prior* to Mason's filing date. In that case, as in the instant case, the evidence cast no cloud on the good faith of the senior party, and the court observed that his invention was an independent act. After a very thorough and careful analysis of the leading cases applicable to the question involved, the court said: "Considering, then, this paramount interest of the public

in its bearing upon the question as presented here, we think it imperatively demands that a subsequent inventor of a new and useful manufacture or improvement, who has diligently pursued his labors to the procurement of a patent, in good faith, and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward."

In *Thomson* v. *Weston,* 19 App. D. C. 373, there was a delay of about four years by Thomson after conception and reduction to practice in filing his application, and Weston's patent antedated by a few months the Thomson application. After referring to the decision in *Mason* v. *Sargent,* the court said: "It is true that the time of concealment in this case was something less than four years, as against seven years in that period. The mere difference in time, however, is not sufficient to effect the application of the principle, for it is as certain in one case as in the other that the application for the patent was solely stimulated by the publication of the patent granted to another inventor. No substantial or even plausible excuse for Thomson's inaction is disclosed by the testimony.   *   *   *   The particular object of the beneficence of the patent law is the individual who first conceives and with diligence perfects, an invention. And where one has completed the act of invention his right to the reward in the form of a patent becomes complete, save in two instances that may be satisfactorily shown to exist. First, he loses the right, as against the public in general, by a public use for the statutory period. Second, by deliberate concealment or suppression of the knowledge of his invention he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and bona fide inventor who, during the period of inaction and concealment, shall have given the benefit of the discovery to the public. Viewed in the light of 'the true policy and ends of the patent laws,' the latter is the first to invent, and therefore entitled to the reward."

There was less delay in *Matthes* v. *Burt,* 24 App. D. C. 265,

than in the present case, and in that case the Matthes application was filed while Burt's was still pending in the Patent Office. The invention related to billiard ball, and the evidence showed that after Matthes had tested his invention to his own satisfaction and to the satisfaction of his employer, "it was laid aside and the manufacture was continued in the old way." Meanwhile Burt, working independently, conceived the same invention, and promptly proceeded to utilize it and sell the product. He applied for a patent without delay, and shortly thereafter Matthes, having learned of Burt's success, also filed an application. The court ruled that Matthes, in concealing his invention for three and a half years, forfeited his rights as against Burt. The court also said: "That Burt's application had not ripened into a patent before Matthes filed his does not substantially affect the application of the cases of *Mason* v. *Hepburn,* 13 App. D. C. 86, and others, *supra.* Whilst the possession of a patent makes, ordinarily, a stronger case in favor of the holder, the doctrine in respect of concealment by one earlier to invent does not necessarily depend upon that fact. In *Warner* v. *Smith,* 13 App. D. C. 111, 115, in which the reasons for that doctrine are explained at length, the later inventor had not received a patent."

In the present case Bliss concealed his invention for a period of five years after his tests convinced him "that it was the best system in existence, in June, 1897." He invented and exploited another system, and did nothing with or about this system until he saw the Creveling patent. Having discovered that Creveling's patent encroached upon his invention he filed an application for so much of the invention as the Creveling patent covered. It was not until he saw the McElroy patent, a year and a half later, that he filed this application covering all his invention. The following reference to his cross-examination is timely:

"Q. You are aware, are you not, that Mr. McElroy has a car-lighting system on the Delaware & Hudson Railroad?

A. Only by hearsay.

Q. Were you aware of it at the time you filed your application in issue?

A. I understood that he was carrying on some kinds of experiments in this line."

The conclusion is irresistible that Mr. Bliss set this system to one side because he believed he could invent a better one. It is equally clear that, having invented what in his opinion was a better system, he permitted this one to remain to one side until others, after independent and patient efforts, had conceived and developed similar systems. Then, to clear the field of troublesome competition, he sought a patent. The patent laws were not enacted for any such purpose. They were not enacted to discourage, but to stimulate, inventions, and, as was pointed out in *Mason* v. *Hepburn, supra,* the object of the government in fostering inventions is to benefit the public. The public receives no benefit from an invention that is locked up in a cupboard, or exists only in the brain of the inventor. For this reason it is the policy of the law to encourage activity and diligence, and discourage delay.

The reasons for the delay in this case are not sufficient as to any of the counts of the issue, and we therefore affirm the decision of the Commissioner, and it is so ordered.

The clerk of the court will certify this opinion and the proceedings in this court to the Commissioner of Patents, as required by law.                              *Affirmed.*